## UNITED STATES v. MANSOUR.

(District Court, S. D. New York. August 18, 1908.)

1. JURY (§ 19*)—TRIAL BY JURY—SUIT FOR CANCELLATION OF CERTIFICATE OF NATURALIZATION.

A suit for the cancellation of a certificate of naturalization, brought under Act June 29, 1906, c. 3592, § 15, 34 Stat. 601 (U. S. Comp. St. Supp. 1907, p. 427), is not one in which defendant is entitled as of right to a jury trial.

[Ed. Note.—For other cases, see Jury, Dec. Dig. § 19.*]

2. ALIENS (§ 71½*)—NATURALIZATION—CANCELLATION OF CERTIFICATE—CONSTITUTIONALITY OF STATUTE.

The provision of Act June 29, 1906, c. 3592, § 15, 34 Stat. 601 (U. S. Comp. St. Supp. 1907, p. 427), authorizing any court, authorized to naturalize aliens in the district where a naturalized citizen may reside at the time of bringing the suit, to entertain a suit for the purpose of setting aside and canceling the certificate of citizenship on the ground of fraud, or that it was illegally procured, although it confers jurisdiction to cancel certificates granted by other courts, is not unconstitutional, but was within the power of Congress.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. § 71½.*]

3. ALIENS (§ 71*)—NATURALIZATION—CANCELLATION OF CERTIFICATE—FRAUD.

A certificate of citizenship granted to an alien who had not been a bona fide resident of the United States for the next preceding five years, and who did not intend to become such resident, but desired the citizenship for his protection in a foreign country, will be canceled for fraud.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. § 71.*]

Petition to cancel and set aside defendant's certificate of naturalization as having been illegally or fraudulently procured, brought under authority of act of Congress approved June 29, 1906 (Act June 29, 1906, c. 3592, 34 Stat. 596 [U. S. Comp. St. Supp. 1907, p. 419]).

On May 4, 1901, the defendant received a certificate of naturalization from the District Court of the United States for the Eastern District of New York. He obtained it without a "first paper," on the ground that he had first come to this country when under 18. The court record, therefore, consists only of the depositions of applicant and witness taken on the 3d of May, and the oath of allegiance and order of admission taken and entered on the day following. None of the court officers concerned in the application has any recollection of the applicant or his witness.

The present petition or complaint asserts in substance two reasons for revoking or canceling this grant of naturalization: (1) That Mansour himself never took or subscribed the oath of renunciation and allegiance, but procured another to personate him throughout the proceedings, in violation of fundamental rules of honesty in any legal proceeding, as well as of Rev St. § 2165 (U. S. Comp. St. 1901, p. 1329); and (2) that Mansour had not on the 4th of May, 1901, resided within the United States for the continued term of five years, as required by Rev. St. § 2170 (U. S. Comp. St. 1901, p. 1333).

Upon these two issues much testimony has been taken, for the most part in open court, and from witnesses who have not impressed the court as either accurate or desirous of telling the truth. It is established, or asserted and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not denied, that Mansour is a Levantine Hebrew, born in Syria in 1875, and one of a numerous family of brothers, who, severally or jointly, have during the times under investigation sojourned and transacted business in Manchester, England, Cairo, Hayti, New York, and perhaps Marseilles. Before his naturalization this Mansour went frequently to Hayti, and on the day he received his certificate he left the United States, and at least as early as 1902 became a resident of Port-au-Prince, Hayti, there remaining until 1906, when he was compelled to leave by governmental interference with his business, and under circumstances which he conceives entitle him to redress through diplomatic channels. On leaving Hayti he came to New York, and presented a claim against the Haytian Republic to the Secretary of State, whereof the foundation, of course, is his American citizenship. This suit is really a proceeding to test Mansour's right to have his demand championed (if just) by the United States, and has been pressed by the agents of Hayti, who have very obviously furnished the information and witnesses on which the complainant relies. This finding is made on request of defendant, although I do not deem it material. According to defendant's own story, he came to New York at the age of 15, in 1890, on a ship he does not remember, and under an Italian name he has also forgotten, the name being that written in a passage ticket bought from a broker. He then spoke Arabic, classic or "high" Hebrew ("the Hebrew of the Bible"), a little Italian and a little French, but he spoke, read, or wrote no English at all. From 1890 to 1901 he lodged in the Hebrew quarter of the East Side of this city, and peddled such articles as he could carry over his arm (e. g., tablecloths), confining his operations to the quarter in which he lodged, "selling only to Jewish people." It was there and among these people he learned English, and by 1901 he \spoke (so he testifies) as he did at the trial. But the Yiddish jargon he never learned. His absences from New York during these 11 years were confessedly frequent. He first declared that he remained in New York until 1895 or 1896, and then, on the formation of the Haytian firm of Isaac Mansour Frères, began to go to Hayti for two or three months in each year, so continuing until 1901, when on the day of his admission to citizenship he left the country; later in his evidence, however, Mansour declared that he went to Hayti every year after 1890. The business of Isaac Mansour Frères seems to have been considerable, "a bright business" in defendant's phrase, yet, when in New York, this rather important merchant walked Hester, Essex, and Chrystie streets peddling (inter alia) tablecloths at $2.50 each, from a supply carried over his arm.

To call this story difficult of belief is a moderate statement. A cloud of witnesses have been produced to show where Mansour lodged, and what he traded in, during these 11 years. It would be useless to digest their evidence in detail, but from it I draw the following inferences:

(a) These witnesses knew nothing of Mansour's English and Haytian connections; (b) they did not know him at all well; (c) their dates do not wholly agree with Mansour's, nor with each other's, and the lack of agreement is so great as to impeach their accuracy; and (d) what knowledge of defendant they had seems to end about 1899—this last observation, however does not apply to the three Tonkins and one Kraemer, to whom reference will be made later.

From this evidence I find that Mansour did spend much of his time in New York between 1890 and 1899, and in 1901 spoke and wrote English. It is further obvious from his appearance and demeanor in court that he is a man of intelligence and shrewdness, writing French more readily than English, and speaking such English as was never learned on the East Side of New York. His accent, intonation, and choice of words are all those of one who learned French first and then English from Englishmen, rather than from any Americans, not to speak of those who practice the dialect of the Bowery, with foreign-born tongues.

Taking the personation charge: The complainant avers that, when Mansour desired a naturalization certificate, he hired one Sersock to make the application in his name, answer the necessary questions, and write the name Mansour as required; and hired also one Araman to represent himself as Joseph T. Dina, a business associate of Mansours, and as Dina serve as

witness and write Dina's name at the foot of the usual deposition. Sersock and Araman have been produced, and they swear to this story. In 1901 Araman was 18 years old, and so ignorant that he says he copied the name Joseph T. Dina from his cuff, being unable to trust his own ability to write from memory. Sersock's age has not been testified to, but from his appearance in 1908 he was less than 18 in 1901; while his story of the occurrences in Brooklyn on May 3 and 4, 1901, cannot be accurate in all its details. Neither of these confessed criminals testified with any appearance of sincerity, and I remain of the opinion expressed at the hearing, that, while their tale might be true, it was not true because they testified to it. It is, moreover, in the light of the findings above made, nearly incredible. No matter how infirm Mansour's residence may have been, nor how improper his motives for wishing to go through the form of naturalization, he did not need the assistance of two boys of 18 to personate a man of 26, nor the help of lads of intelligence far less than his own, whose writing was worse than his rapid and vigorous French script. The prosecution feels this, and has introduced the testimony of distinguished handwriting experts, to show that the round, unformed schoolboy American hand, in which defendant's name is signed to the court records, is that of Sersock. And other experts have testified for the defense. What these gentlemen have expressed their opinions about, however, is really this: Given specimens of Sersock's and Mansour's handwriting of 1907–08, which does the 1901 court record most resemble? On this question I think the prosecution has much the best of it, but the opportunities for error are so great, in view of the lapse of time, and the youth of Sersock in 1901, that I am not willing to rest judgment upon the expert testimony. On the contrary, I find the balance of evidence to incline in defendant's favor on this personation question, by reason of the testimony of Kraemer—with some support from Wiederhoef and Rosenfeld, whose rather vague recollections seem at all events disinterested. Kraemer is a familiar New York figure, a small politician, just the sort of man who would naturally stand sponsor to or supervise the naturalization of any resident or alleged resident of his neighborhood. He seemed to me the most credible witness produced, and, principally from his testimony, I am of opinion that the prosecution has not proved by a fair preponderance of credible evidence that Mansour did not on May 3 and 4, 1901, personally take the necessary oaths and sign the necessary documents preliminary to his naturalization.

On the issue of residence, my view of some of the evidence has been already stated.

Mansour's story of where, when, and how he learned English, is utterly incredible, and a fair knowledge of English of the same kind as he now uses is attributed to him as early as 1891 by some of his own witnesses.

Again, for some reason he wishes to conceal something regarding his frequent visits to Hayti prior to 1901; for he says he traveled under assumed names which he has forgotten and on ships he does not remember. This cannot be wholly believed; but the position taken so obviously renders further investigation through ships' manifests, etc., impossible, as to suggest a reason for forgetfulness. These difficulties in Mansour's statement have been legitimately used by the prosecution as arguments that he was not in New York at all during most of the time he swears to. Undoubtedly it is strange that a man of his obvious intelligence and superior attainments, should after 11 years' residence in New York, be able to produce as acquaintances only the ignorant and humble persons who have appeared (for the most part) as witnesses, several of whom could only talk with Mansour (it is said) in the English he says he was then learning, yet the English of the witnesses left no trace in defendant's speech, and defendant must be supposed to have consorted of choice with persons beneath him in intelligence and acquirements and from whom he could not even learn the language of the country. This part of Mansour's tale is improbable, but not impossible, and, remembering that the burden of proof is not on him, I am not justified in rejecting a substantially uncontradicted story for improbability only.

Therefore it is accepted as true that defendant spent the major portion of his time in New York from 1890 to 1899.

After 1899 he says he lived with the Tonkins until the early part of

1901, when he admits going to Hayti, whence he returned on April 29th, to be naturalized on May 4th, and to definitely leave the United States on the same day. The Toukins are unworthy of belief. The husband admitted telling the government examiner that Mansour lived with him two years (i. e., 1897–99), and in open court he swore to four years; while the wife first said two years, and then expanded it to four. As before noted, a departure of Mansour from New York about 1899 fits in with the recollection of most of the witnesses who only pretend to remember defendant as a peddler; while here again I fall back on the testimony of Kraemer, this time as turning the scale against defendant. Kraemer most positively swore that Mansour told him he was going to leave the United States to go into business and better business for himself, that this was about a year and a half before he again appeared and requested Kraemer to see him through his naturalization matter, and he then stated that after getting his papers he was going away again. This I believe to be the truth, and accordingly find that, while Mansour sojourned in New York most of the time from 1890 to 1899 (about), there is no evidence of any intention on his part to remain; but there is also no evidence of intention to permanently depart. In 1899 or thereabouts he permanently abandoned New York, and took personal charge of the business of Isaac Mansour Frères in Hayti; in 1901 he was, as he informed the custom's inspector on April 29th, a resident of Port-au-Prince; he never at any time resided at 144 Hamilton avenue, Brooklyn; and from about 1899 until 1906 he neither sojourned for any length of time in the United States, nor had in this country any domicile, residence, or habitation. When he applied for and obtained naturalization, it was for the purpose of protection in Hayti, and not in order to participate in the government of this republic; nor had he when naturalized any intention of settling or living or residing within its limits.

H. L. Stimson, U. S. Atty., and Francis W. Bird, Asst. U. S. Atty. Douglas & Armitage and William L. Penfield, for defendant.

HOUGH, District Judge (after stating the facts as above). The second cause of action set forth in the petition is dismissed for total lack of evidence.

The third and fourth causes of action are dismissed, because not sustained by a fair preponderance of credible testimony.

The first cause of action presents the question of residence, and, under the findings of fact above made, an order or judgment must be entered canceling Mansour's certificate of naturalization, unless: (1) This proceeding is one in which defendant is entitled as of right to a jury trial, which has been duly demanded and refused; or (2) the act under which the case is brought be unconstitutional.

First. The method of trying any cause or suit must depend on either: (a) Constitutional direction, (b) legal requirement of (b$^1$) statute law or (b$^2$) controlling decision, or (c) judicial discretion. It has not been asserted that the Constitution touches this branch of the matter.

The act under which the case is brought is silent as to the method of trial, and this, so far as I am informed, is the first trial under the fifteenth section thereof. There are therefore no directly controlling authorities. The proceeding, however, if not sui generis, somewhat resembles a bill to revoke or set aside a grant or patent, or to cancel and vacate a judgment, and such causes are not of right triable by jury. So far as I have discretion in the matter, cases such as this will always be tried without a jury. If the enforcement of the fifteenth section of the act is to depend on the hurried hit or miss of

a jury trial, the section might as well be repealed, and it is also true that owing to the technicalities still tolerated, if not encouraged, in our jury procedure, jury cases always occupy more court time than the same number of equity trials; and this court certainly has no time to spare.

Second. The unconstitutionality of an act of Congress may well be left, in all but most extraordinary cases, to the higher courts, as was done in Spreckels Co. v. McClain, 113 Fed. 244, 51 C. C. A. 201. As, however, the discussion has been extended, and I recognize the attractiveness to many professional minds of much of defendant's argument, my own inclination in the matter will be briefly noted.

(1) It is asserted that the fifteenth section of the statute is obnoxious to the "ex post facto" clause of the Constitution. It seems to me that said section is not within the definition of Calder v. Bull, 3 Dall. 386, 1 L. Ed. 648, nor does it inflict a penalty or punishment, within the extension of the rule created by Ex parte Garland, 4 Wall. 333, 18 L. Ed. 366.

(2) The remaining objections to the act do not seem to me to raise a constitutional question. Thus it is said to be monstrous that any court other than the one which entered the judgment or decree should set it aside at the instance of one of the parties thereto, it not being pretended that the proceeding in which the judgment was entered was beyond the first court's jurisdiction. This is familiar law, and has been applied in naturalization matters. U. S. v. Gleason, 90 Fed. 778, 33 C. C. A. 272. But no reason has been pointed out why Congress, having general and exclusive power over naturalization, should not vary this rule, and authorize the action to be brought, not in a jurisdiction from which the defendant may long have removed, but in the place where he presently resides.

It is further objected that, since the order granting Mansour citizenship is a judgment or decree entered after a hearing and the taking of testimony, there was on such hearing an opportunity to try the very issue here raised, and, Mansour having prevailed, all mere errors are cured; while the United States as a party to that judgment is estopped from showing even its fraudulent procurement, because the judgment itself is the highest evidence that there was none. For this view of the binding sanctity of judgments many cases have been cited, the strongest of which is Greene v. Greene, 2 Gray (Mass.) 361, 61 Am. Dec. 454.

Well known as is this line of decisions, it remains true that courts granting naturalization have for generations revoked or canceled their own grants or judgments, when convinced that they had been imposed upon, or deceived, but only upon application of the government. The numerous cases are collected in House Doc. 326, 59th Cong. p. 131 et seq. (a letter from Secretary Root to Congress on the subject of citizenship and expatriation). This long-continued practice is not reconcilable with the view that declares a certificate of naturalization to be a judgment; but since the present act the question is academic, for here again Congress has declared that fraud or illegality shall be enough to set aside the judgment (if it be one), and no reason is sug-

gested why the statute does not overrule the decisions (if they are applicable).

Finally, the court is asked to consider the cases holding that a naturalized citizen is as much a citizen as any other, and to observe that the provisions of the act regarding the effect of five years' residence abroad constitute, as to naturalized aliens, an unconstitutional attack upon their rights as citizens. I decline to do this; the question is not involved in this case, and, even if there be force in the contention made, the expatriation clauses of the section are clearly separable from the words authorizing and directing this proceeding.

There having been personal fraud by Mansour in the procurement of his certificate of naturalization, in that he falsely swore to the necessary residential facts, the prayer of the petition is granted.

