UNITED STATES of America, Plaintiff,

v.

Frank WALUS, a/k/a Franciszek Walus, Defendant.

No. 77 C 279.

United States District Court, N. D. Illinois, E. D.

May 30, 1978.

Thomas P. Sullivan, U. S. Atty., John L. Gubbins and William F. Conlon, Asst. U. S. Attys., Chicago, Ill., for plaintiff.

Robert A. Korenkiewicz, Chicago, Ill., for defendant.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, Senior District Judge.

This is an action under the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, *et seq.*, to cancel the Certificate of Naturalization of the defendant, Frank Walus, also known as Franciszek Walus, and to revoke the order admitting him to United States citizenship. That order was entered by the United States District Court for the Northern District of Illinois on August 18, 1970. The court's jurisdiction in this matter derives from 8 U.S.C. § 1421(a).

The activities of the German Gestapo during World War II constitute one of the darkest chapters in world history. Walus' role therein is at the heart of this litigation. In September of 1939, the German military forces invaded the Polish towns of Kielce and Czestochowa (or Tschenstochau).[1] In Czestochowa, in early 1940, a large ghetto was established wherein members of the Jewish population were required to live. The large ghetto in Czestochowa was liquidated in September, 1942, and a smaller ghetto was established for those Jews who remained. That smaller ghetto was subsequently liquidated in 1943. Similarly, in Kielce, a large ghetto was established in the spring of 1941 for the Jewish population of that city. This ghetto was liquidated in August of 1942. Remaining Jews were thereafter contained in a smaller ghetto until its liquidation in 1943.[2]

In its four-count complaint, the plaintiff, United States of America, asserts that during World War II the defendant was a member of the German Gestapo, the Schutzstaffeln (or "SS"), or other similar organization (hereinafter collectively re-ferred to by the term "Gestapo"). Acting in that capacity, he is alleged to have committed a number of "war crimes" or war atrocities against civilians in Czestochowa and Kielce, Poland between 1939 and 1943. The plaintiff also asserts that the defendant concealed both his membership in the Gestapo and the commission of those atrocities from the immigration authorities when he obtained his United States citizenship. It is on the basis of these allegations that the plaintiff seeks the cancellation of Walus' Certificate of Naturalization and the revocation of his United States citizenship.

Section 316(a) of the Immigration and Nationality Act, as codified in 8 U.S.C. § 1427(a), provides that:

No person . . . shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

In Counts I and II, the plaintiff asserts that the fact of the defendant's commission of war atrocities and/or his membership in the Gestapo was material to the good moral character requirement of § 316(a). By fail-

---

1. Kielce and Czestochowa are approximately 60 miles apart. See Rand McNally World Atlas (Premier Ed. 1946); Hammond's Illustrated Library World Atlas (1948).

2. Liquidation was the process by which Jews were removed from these cities and shipped to either the German work or death camps. The first liquidations involved women, children, and men physically unable to work. Thus, after the first liquidations, only ablebodied males remained. The final liquidations involved all Jews then remaining in the given cities.

ing to report this information, Walus is alleged to have procured his naturalization by concealment of a material fact or by willful misrepresentation. Such concealment or misrepresentation assertedly constitutes a violation of § 340(a) of the Act, 8 U.S.C. § 1451(a), for which revocation and setting aside are prescribed. Section 340(a) is in relevant part as follows:

It shall be the duty of the United States Attorneys . . . upon affidavit showing good cause therefor, to institute proceedings . . . for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively . . . . .

In Count III, the actual commission of war crimes in Czestochowa and/or Kielce, Poland between 1939 and 1943 is alleged as an additional basis for the relief sought. The Government argues that because of his commission of or participation in crimes or atrocities, Walus lacked the good moral character required for naturalization under § 316, 8 U.S.C. § 1427, and thus procured his naturalization illegally. Finally, in Count IV, Walus is alleged to have given false testimony during his naturalization proceeding when he knowingly concealed his membership in the Gestapo and his commission of war crimes; these acts of concealment constitute a sufficient failure to satisfy the good moral character requirement of § 316, 8 U.S.C. § 1427, to warrant the issuance of the prayed for order of cancellation and revocation. See § 101(f)(6) of the Act, 8 U.S.C. § 1101(f)(6), which provides that "(n)o person shall be regarded as, or found to be, a person of good moral character who, . . . has given false testimony for the purpose of obtaining any benefits under this (Act) . . . ."

A showing that an applicant for citizenship lacked the requisite good moral character and that such lack of character was concealed from immigration authorities is sufficient to warrant the entry of an order of revocation and cancellation. *United States v. Wisdom*, 320 F.Supp. 286 (E.D. Tenn.1970), citing *Berenyi v. District Director, Immigration and Naturalization Service*, 385 U.S. 630, 637, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967); *In re Haniatakis*, 376 F.2d 728 (3rd Cir. 1967); *Petition for Naturalization of K.*, 174 F.Supp. 343 (D.C.Md. 1959). Alternatively, in any case where a petitioner has obtained his order of admission to United States citizenship and Certificate of Naturalization by concealment of material facts and willful misrepresentation, revocation and cancellation are appropriate. *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *United States v. Riela*, 215 F.Supp. 914 (D.C.N.J.1963), aff'd., 337 F.2d 986 (3rd Cir. 1964); *See also, Knauer v. United States*, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946).

It cannot be doubted that Walus' conduct during World War II, as it has relevance to a determination of his moral character, could properly be considered in determining whether to grant his Petition for Naturalization. Section 316(e) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1427(e) provides in relevant part:

. . . . in determining whether the petitioner has sustained the burden of establishing good moral character . . . The court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration as a basis for such determination the petitioner's conduct and acts at any time prior to that period.

Numerous courts have recognized that an applicant's complete past is subject to examination in the evaluation of his fitness for citizenship, and further that this same scope applies in a suit seeking cancellation and revocation thereof. *Costello v. United*

*States, supra; Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960); *United States v. DeLucia,* 256 F.2d 487 (7th Cir. 1958); *Stevens v. United States,* 190 F.2d 880 (7th Cir. 1951).

Nor can it be doubted that if the Government has established its allegations against Walus, it is entitled to the relief it seeks. Failure to disclose the commission of crimes or offenses during naturalization proceedings can constitute a sufficient concealment of a material fact to justify denaturalization. *Costello v. United States, supra; United States v. DeLucia, supra; United States v. Montalbano,* 236 F.2d 757 (3rd Cir. 1956); *Corrado v. United States,* 227 F.2d 780 (6th Cir. 1955); *United States v. Accardo,* 208 F.2d 632 (3rd Cir. 1953); *cert. denied,* 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954). *See also, United States v. Genovese,* 236 F.2d 757 (3rd Cir. 1956), *cert. denied,* 352 U.S. 952, 77 S.Ct. 327, 1 L.Ed.2d 244 (1956); *United States v. Oddo,* 314 F.2d 115 (2nd Cir. 1963); *Stacher v. United States,* 258 F.2d 112 (9th Cir. 1958). Thus, by sustaining its burden as to the facts alleged in its complaint, the Government demonstrates that it is entitled to have the court enter an appropriate order granting the relief sought in its complaint.

The court appreciates that if the relief sought by the Government is ordered, the defendant will be divested of one of his most fundamental rights, that of American citizenship. For this reason, naturalization decrees are not to be revoked without the utmost consideration. To sustain its burden of proof in a denaturalization proceeding, the United States must therefore establish its allegations by evidence that is clear, convincing, unequivocal, and such as does not leave the issue in doubt. *See Costello v. United States,* 365 U.S. at 269, 81 S.Ct. 534, and *Chaunt v. United States,* 364 U.S. at 353, 81 S.Ct. 147, both citing *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943) and *Baumgartner v. United States,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); *see also United States v. Montalbano,* 236 F.2d at 758; *Petition of Cardines,* 366 F.Supp. 700 (D.C. of Guam 1973); *Petition of Arevalo,* 352 F.Supp. 215

(D.C. of Haw.1972). In the instant proceeding, the placement of this heavy burden on the Government is warranted not only because the right sought to be canceled is a valuable one, but also because of the grave nature of the factual allegations underlying that effort.

In his answer, Frank Walus denies the allegations that he committed "any and all of the crimes alleged . . .", denies membership in "the Gestapo, "SS" or other similar organizations . . . ", and denies that he failed to satisfy the good moral character requirement of 8 U.S.C. § 1427(a). As affirmative defenses, the defendant has also alleged that this action is barred by a statute of limitations. He further contends that "(t)o hold any person to answer to alleged criminal activity which occurred between thirty-four and thirty-seven years prior to the filing of any complaint is unconscionable, prejudicial and a deprivation of (his) rights of Due Process and to a fair trial as guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States."

The defendant's answer also contained a demand for trial by jury. Under the Seventh Amendment to the United States Constitution, "(i)n Suits at common law . . . the right of trial by jury shall be preserved . . . ." However, as early as 1908, the federal courts have held that a defendant has no right to a jury trial in civil denaturalization proceedings. *United States v. Mansour,* 170 F. 671 (S.D.N.Y. 1908), *aff'd. without opinion,* 226 U.S. 604, 33 S.Ct. 217, 57 L.Ed. 378 (1912). Additionally, as early as 1912, the United States Supreme Court recognized the equitable nature of deportation proceedings. *Johannessen v. United States,* 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066 (1912). That position was reaffirmed the following year when the Supreme Court specifically rejected the argument that the lower court had erred in not according a trial by jury to a defendant in a denaturalization proceeding. *Luria v. United States,* 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101 (1913). A civil denaturalization

proceeding was held to be " . . . not a suit at common law. The right asserted and the remedy sought (are) essentially equitable, not legal, and this, according to the prescribed tests, (makes) it a suit in equity." *Id.,* at 27–28, 34 S.Ct. at 15.

Subsequent cases have uniformly recognized the equitable nature of civil denaturalization proceedings. *Knauer v. United States,* 328 U.S. 654, 671, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946); *United States v. Jerome,* 16 F.R.D. 137, 138 (S.D.N.Y.1954); *In re Oddo,* 117 F.Supp. 323, 324 (S.D.N.Y.1953), *rev'd on other grounds,* 219 F.2d 137 (2nd Cir. 1955). *See also, United States v. Kusche,* 56 F.Supp. 201, 225 (C.D.Calif. 1944). Additionally, a number of federal courts have, in passing, stated that in such proceedings no right to a jury trial is present. *United States v. Matles,* 247 F.2d 378, 381 (2nd Cir. 1957), *rev'd on other grounds,* 356 U.S. 256, 78 S.Ct. 712, 2 L.Ed.2d 741 (1958); *United States v. Jerome,* 16 F.R.D. at 138. And two relatively recent federal district court decisions have refused to allow a jury trial in denaturalization proceedings. *United States v. Kaplan,* 150 F.Supp. 577 (D.C.Conn.1955); *Chin Fook v. McGrath,* 92 F.Supp. 614 (N.D.Calif. 1950). It was on the basis of these decisions that the plaintiff moved to strike the defendant's jury demand.

Against this authority, the defendant argued that the Supreme Court's decisions in *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) and *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) mandate this court's rejection of these numerous cases. In both *Beacon* and *Dairy Queen,* however, elements that were common law in origin were present. A civil denaturalization proceeding, both as to the right asserted and the remedy sought, is equitable, and not legal, in nature. *See Luria v. United States, supra,* and the numerous other cases now cited. Therefore, *Beacon Theatres, Inc. v. Westover, supra,* and *Dairy Queen, Inc. v. Wood, supra,* do not control.

In rejecting these two cases, the court also rejected the primary argument advanced by the defendant in support of his demand for a jury trial. The defendant argued that common law issues are presented because of the criminal nature of the Government's allegations, and because, on the same facts, the plaintiff could proceed against the defendant criminally under 8 U.S.C. § 1425. The defendant also found support for his attempt to cast this as a criminal proceeding in the jury trial guarantees of Art. III, § 2, cl. 3 of the United States Constitution, as well as in the Fifth and Sixth Amendments thereto. Otherwise civil proceedings are not, however, considered criminal matters simply because certain allegations, if proven, would support a criminal indictment. A denaturalization proceeding is a civil action in equity to consider only whether the defendant's Certificate of Naturalization should be revoked and his citizenship canceled. It is not a criminal prosecution. *United States v. Matles,* 247 F.2d at 379, 381. *Sourino v. United States,* 86 F.2d 309 (5th Cir. 1936), *cert. denied,* 300 U.S. 661, 57 S.Ct. 491, 81 L.Ed. 869 (1936). For these reasons, on September 30, 1977, this court granted the Government's motion to strike the jury demand, and on March 20, 1977, proceeded to trial sitting without a jury.

An applicant for American citizenship is required to submit an Application to File Petition for Naturalization (Form N–400). On the basis of the information contained in this document, plus such information as is elicited during a personal interview, the Naturalization Examiner passes on the qualifications of the applicant. While, under 8 U.S.C. § 1421, the final determination to grant or deny a Petition for Naturalization rests with the federal courts, the recommendation of the Naturalization Examiner is critical to the decision to admit an applicant to United States citizenship.

Frank Walus was first admitted to the United States as a permanent resident on January 15, 1959. On April 16, 1970, he submitted his Form N–400. On July 13, 1970, Walus appeared before Examiner Julius Solar and was examined as to the contents of his application. Based on their

discussion, Solar made certain corrections or additions to Walus' application. Thereafter, Walus signed the affidavit portion of his Form N–400; under oath, he also swore to the accuracy and completeness of the document, as corrected.

Question 6(a) of Form N–400 requires the applicant to disclose any crimes knowingly committed even though such crimes had not precipitated an arrest. Question 6(b) addresses arrests, charges, indictments, fines, convictions, or imprisonments suffered by the applicant "for breaking or violating any law or ordinance, including traffic regulations . . . ." Walus originally answered both portions of Question 6 in the negative, but during his interview with Naturalization Examiner Solar, acknowledged that he had been arrested in Poland in 1950 as a "political (who) wanted to escape from Poland." The charges relating to that arrest were subsequently dismissed. No other changes were made to the defendant's answers to Question 6, which thereunder otherwise remained negative.

In Question 7, the applicant is required to "(*l*)ist (his) present and past membership in every organization, association, fund, foundation, party, club, society, or similar group in the United States and in any other place and (his) foreign military service." In response, Walus originally listed:

   (a) UAW Union Local 719–1966 to present;

   (b) Wrestling Sport Club in Poland—1948 to 1963.

During his examination with Julius Solar, Walus caused and adopted the following additions:

   (c) Labor Union (Zuiazch Zawokowy) Shipyard—1948 to 1949;

   (d) Polish Journal Club, Kielce—1956 to 1957;

   (e) Polish Alliance, Chicago, 1970 to date.

On August 18, 1970, with the recommendation of Julius Solar, Walus was naturalized and became a citizen of the United States. On that same day, he was issued Certificate of Naturalization No. 9308391.

The Government's allegations directly attack the defendant's answers to Questions 6

and 7 on Form N–400. A failure to list Gestapo membership and/or the commission of war crimes or atrocities clearly constitutes a failure to provide crucial information as sought by those questions. It is inconceivable to the court that Walus could both have been guilty of the facts now alleged and not have knowingly concealed or misrepresented his involvement therein in his answers to Questions 6 and 7.

Twelve former inmates of the Jewish ghettos of either Czestochowa or Kielce testified that they observed Frank Walus, acting in the capacity of a Gestapo agent, engage in extreme and unprovoked violence against civilians. These witnesses' identifications of this defendant as the individual who committed these actions included positive recognition of him in photographic displays, recollection of his name and certain physical characteristics (primarily his general build and height), and in-court identifications. Their testimony was powerful and convincing; it was also, to a high degree, consistent among the witnesses.

All twelve testified that Walus was actively involved as a Gestapo agent in Czestochowa and Kielce. They also recounted various killings and other acts of unjustified violence against ghetto Jews and other Polish civilians which they testified were committed by Walus. The conduct described by these witnesses must properly be characterized as constituting war crimes or war atrocities.

The Government also produced four people who have had contact with Walus subsequent to his naturalization. By their testimony, these witnesses detailed purported admissions of the defendant regarding his activities during World War II.

Walus' evidence in support of the answers given on his Form N–400 and in defense against the Government's proofs was to the effect that he was in no way involved in Gestapo activities in Poland or elsewhere during World War II. Rather, the defendant claimed that throughout the relevant period he was a forced laborer

working on various farms near Ulm, Germany.[3]

Before examining the defendant's evidence in detail, it is helpful to briefly review Walus' activities prior to World War II. Frank Walus was born on July 29, 1922, in Germany to parents who were Polish citizens. Despite their Polish citizenship, the family remained in Germany through 1932. During his German residency, Walus attended the local schools and learned the German language. He was referred to as Franz Walus by German associates.

Upon the death of their father, Walus and his sister returned with their mother to her home in Fanislawice, Poland, which is near Kielce, Poland. Walus stated that he resided in Fanislawice until March of 1940, although on occasion he did live with and work for neighboring farmers or relatives. In September of 1939, at the time of the German military invasion of Poland, he was working on an uncle's farm in Pawel Wilka, Poland. Upon learning of the invasion, Walus testified that he returned to Fanislawice, where he remained until, on March 2, 1940, "he was rounded up along with other youngsters from his village and shipped off to Germany to perform forced labor." Walus would then have been seventeen years, seven months old.

According to his testimony, between early March and approximately June 5, 1940, the defendant worked on a farm owned by Karl and Viktoria Ritter and located in Kleinkotz, Germany. However, "because he was physically too small and weak to perform all of the chores he was required to do, he was returned to the labor office by the Ritters in exchange for a stronger worker."

In June of 1940, Walus stated that he was sent to the farm of August and Maria Zeller in Bubenhausen, Germany. While there, Walus testified that he made an escape. He fled, according to his testimony, as far as Munich before being captured by German police and returned to the Zellers'. The escape attempt lasted three days. The defendant stated that the end result of his escape attempt was the receipt of a 20 Reichmark payment. In May of 1941, because he lacked the ability to perform the farm work adequately, Walus stated that he was returned to the labor office, where he was reassigned to the farm of Ludwig Stolz, located in Wullenstetten, Germany. He remained there until January 1, 1942, when he was once again returned to the labor office as an unsatisfactory worker.

Finally, from the first of January, 1942, through the end of the war, the defendant worked on the farm of Fritz and Walburga Welte, which was also located in Wullenstetten, Germany. While he was on the Welte farm, Walus asserts that German "SS" and police visited the farmhouse in an effort to persuade him to become a German citizen and join the German military. Walus, however, allegedly refused and remained with the Weltes until June of 1945. Thereafter, he associated himself with the Allied Forces.

All of the farms upon which Walus testified he worked are located in the same general area. Wullenstetten and Bubenhausen are both located in the German county of Neu-Ulm. Kleinkotz, while in the County of Gunzburg, is not a great distance away. Because he was a Polish forced laborer, according to his testimony Walus was required to wear a badge with the letter "P" on it. This "P" was to be prominently displayed at all times. Polish laborers were also prohibited from fraternizing with German women. Walus testified to two incidents in which Poles who violated forced laborer regulations[4] were "taken away" by German authorities and placed in concentration camps. The importance of this testimony to the court's disposition of this case will be developed at a later point in this memorandum.

---

3. The parties have stipulated that 7.5 million foreigners were taken to Germany as forced laborers during World War II. Of that total, 2.5 million were Poles.

4. In one case the individual was caught stealing wheat, in the other the offense was associating with German women.

In attacking Walus' account of his World War II existence, the Government demonstrated serious inconsistencies between his testimony at trial and his statements on other occasions. Specifically, at trial Walus testified that from 1932 to 1940 his residence was Fanislawice, Poland. From 1940 through 1945, he claims to have resided in Wullenstetten, Bubenhausen and Kleinkotz, Germany. However, in 1958 and again in 1962, in order to obtain immigrant visas, Walus was required to provide a list of his residences from 1938 forward. This information was provided under oath. On neither of these visas did Walus list Fanislawice, Kleinkotz or Bubenhausen. The only German town he listed was Wullenstetten, and on his first visa it is listed only for the year 1945, while on his second, for the years 1940 through 1947. Instead of reporting Fanislawice as his Polish residence prior to the war, Swietochow, Warszawa and Gorss Pewel, Poland were listed. Attempts were made to explain these inconsistencies, but the fact remains that on previous occasions Walus claimed residences materially at variance with those testified to at trial, and his previous statements were made under oath some fifteen and twenty years closer to the times of actual residence.

In addition to his own testimony on the residency issue, Walus also called as witnesses five persons who assertedly were owners of German farms or members of their families and who remembered Frank Walus as a Polish forced laborer during World War II. Four witnesses, Viktoria Ritter, Maria Zeller, Anton Stolz, and Walburga Welte testified that Walus worked on their farms during various periods of the war. Margarete Goelz testified that he visited her home to court her daughter, who is German. Mrs. Goelz also recalled that Walus did work on the Stolz farm during the war. All of these individuals described Walus as small in stature and young in appearance.

Unrebutted, this testimony would be valuable to the defendant. However, its weight was seriously diminished by the Government's cross-examination of these witnesses, which revealed serious inconsistencies with Walus' own testimony, as well as inconsistencies between prior statements made by the witnesses, and their testimony at trial. First, it was shown that the dates of residence given at trial by the five farmers were inconsistent with their prior deposition statements. Second, as will be more fully developed, both as to dates of residence and in other respects, their testimony conflicts with key documentary evidence presented by the defendant.

The farmers' accounts of Walus' life with them differs substantially from his own statements. Mrs. Zeller denied that Walus ever tried to escape, and asserted that he was with her and her husband Karl the entire time he was assigned to work for them. Mrs. Welte denied that Walus was ever recruited for Army service or for German citizenship; in fact, she denied that the German police were ever under her roof throughout the whole of the war. Mrs. Welte also stated that she never knew that the German police took any forced laborers from her area to the concentration camps. Finally, even though, as Walus testified, foreigners were prohibited from fraternizing with German women, Mrs. Goelz testified that Walus frequently visited her home to court her daughter. Walus was in no way disciplined for his visits to the Goelz residence.

In addition to these inconsistencies, the Government also impugned the farmers' credibility by demonstrating possible bias or motive to fabricate testimony. The husbands of the witnesses Walburga Welte, Viktoria Ritter and Maria Zeller were Nazi Party members. Anton Stolz was himself a member of the Hitler Jugend. Additionally, all of the farmer witnesses acknowledged that Walus has maintained personal friendships with them over the years, sending cards and gifts and visiting them in Germany. It certainly seems curious that lasting friendships could emerge from the forced labor situation described in this trial, especially when the forced laborer remained on the particular farm only for a period of months, and then was rejected as unable to perform the work. These witnesses also

admitted that they agreed to testify after Walus visited them and requested their aid. The defendant told at least Mrs. Welte that he "was being persecuted by the Jews."

Finally, the witnesses' own testimony on various collateral matters raises doubts as to their credibility. Each denied ever speaking, either before or during the war, about Hitler, the Nazi Party or the Jews. Considering the magnitude of these issues at the time, such testimony is incredible.

The deposition of one Father Franciszek Tomczyk, a Roman Catholic priest stationed in Poland during the years 1934 through 1945, was read into the record. Father Tomczyk taught Walus when he was a student in the territory of Wierna, which is in or near Fanislawice, Poland. Father Tomczyk claimed to have seen Walus "almost every week" in church during 1939. This testimony is in direct conflict with Walus' own version of his residence during that year. Professor Gerald Sodock of the University of Chicago testified as to Polish and German uses of the names "Franz" and "Frank". He also testified that individuals may be known by various derivations thereof. Professor Sodock's testimony was not helpful to this court in deciding this case.

Were this the only evidence offered by Frank Walus, the decision in this case would present little difficulty. Given the inconsistencies now discussed, and considering the credibility problems exposed by the United States, this defense evidence is patently unpersuasive. However, the defendant also had admitted certain photographic and documentary exhibits. It is to those documents and photographs that the court now turns its attention.

Defendant's Exhibits 33 through 42 consist of photographs assertedly taken between the years 1940 and 1947. With the exception of Defendant's Exhibit 37, which is a photograph of the Welte family, all are said to be photographs of Walus. The defense version of these photographs is as follows: Exhibits 33 and 34, which show a young male in a suit and a tie, were taken while Walus worked on the Ritter farm during the Spring of 1940. Exhibit 35 is a photograph of the defendant with Anton Stolz, and was taken in the Fall of 1941. Exhibit 36 is a photograph of Walus in the company of a young female. The defendant identified the photograph but did not indicate when it was taken. Exhibit 38 is a picture of Walus in the company of the Welte family; it was taken on the Welte farm sometime in 1946. The defendant was dressed in dark uniform-type attire which he described as a United States Army uniform. He was allegedly then on the Welte farm for a visit. Exhibits 39 through 42 were identified by Walus as depicting him in the uniforms of the Polish II Corps and the United States Army, and were said to have been taken between 1945 and 1947.

The court has no difficulty accepting the assertion that Defendant's Exhibits 33, 34 and 38 are photographs of Frank Walus. It is also willing to accept his statement that he appears in Defendant's Exhibits 35 and 36. However, the court does not agree that these photographic exhibits aid his defense.

According to his testimony, the photographs were taken when Walus was between seventeen and twenty-four years old. Specifically, Defendant's Exhibits 33 and 34 allegedly show Walus at approximately seventeen and one-half years of age. Defendant's Exhibit 35 is said to depict him at the age of nineteen, and in Defendant's Exhibit 38 he is purportedly twenty-four years old. Walus supplied no age for Defendant's Exhibit 36.

The court's first difficulty with Defendant's Exhibits 33 through 36 is that in none is Walus wearing the "P" allegedly required of him as a forced Polish laborer. More importantly, after a painstaking examination of each, the court cannot accept the assertion that these are photographs of this defendant at the ages claimed. The court is satisfied that the individual depicted therein, if the defendant, was materially younger than alleged.[5]

---

5. In rejecting the defendant's testimony regarding these photographs the court must also reject the following defense argument: On the back of Defendant's Exhibits 34 and 36 there is

As it has indicated, the court has no difficulty believing Defendant's Exhibit 38 is a photograph of the defendant in his early twenties. However, for reasons that will be developed, that exhibit presents more difficulty than aid to Frank Walus' defense. The image allegedly that of Walus in Defendant's Exhibit 39, which is a photograph of four individuals in uniform plus beret, is too small to support any meaningful conclusion.

Defendant's Exhibits 40 through 42 are of an individual, again in some type of uniform, who is wearing glasses. The defendant asserts they depict him after the war as a member of the Allied forces. He would have been between twenty-three and twenty-five years of age when these pictures were allegedly taken. The court has grave misgivings that Frank Walus appears in these three pictures; if so, they were unquestionably taken when he was much younger than twenty-three to twenty-five years old. This conclusion is based on the court's own examination of Frank Walus as he allegedly appears in Defendant's Exhibits 33 through 36, and, more importantly, on a close examination of Defendant's Exhibit 38, which Walus himself stated was a picture of him when he was twenty-four years old. Frank Walus at twenty-three to twenty-five years of age is not the person shown in Defendant's Exhibits 40 through 42.

Placed in evidence as Defendant's Exhibits 15 through 26, plus 30 and 31 were various documents. Exhibits 15 through 23 are copies of records from German Allgemeine Ortskrankenkasse (A.O.K.). A.O.K. is the health insurance system under which all employees in Germany are now covered. Exhibits 24 through 26 are copies of International Tracing Service documents. The International Tracing Service is an organization which has as its purpose the location of all persons displaced during World War II. Exhibits 30 and 31 are copies of records of the Bundesarchiv and Krankenbuchlager.

Those are two repositories for records and documents of the German Third Reich.

The Krankenbuchlager is a store for old documents and records of injuries, illnesses and causes of death on former military personnel. Defendant's Exhibit 31 is a statement from that office stating it has no records relating to a Franz or Franciszek Walus, born on July 29, 1922. The Bundesarchiv is the Archive of the Federal Republic of Germany. It houses large volumes of documents from the Third Reich. Defendant's Exhibit 30 is a statement from that agency indicating that it has no records or entries on Franz Walus, born on July 29, 1922. The defendant contends that were he a member of the Gestapo as alleged by the United States, some indication of his military past would surely have been discovered from these searches.

In rebuttal to Defendant's Exhibit 30, the Government presented expert testimony from George C. Browder, an associate professor with the State University of New York at Fredonia. Professor Browder is highly knowledgeable in the workings of the Bundesarchiv and the extent of its files. According to his testimony, the German files on the Gestapo and related organizations were largely intentionally destroyed near the end of the war, so that, while extensive, the Bundesarchiv records are extremely incomplete. His estimate was that those records are perhaps 25% to 30% complete. While the lack of any military record relating to Frank Walus is not to be ignored, the incompleteness of the available records must diminish the weight given to Defendant's Exhibit 30. The lack of any military record of illness for Frank Walus indicated by Defendant's Exhibit 31 can also be given but little weight, as that may indicate only that he remained healthy during World War II.

All employers in Germany are required to make monthly payments to the Allgemeine

a stamped notation "Neu-Ulm". The defendant argues that since he was in that area throughout World War II, these photos have conclusively been shown to have been taken when and where claimed. The court does not

agree. This imprint at most indicates only where the photos were developed, not where or when they were taken. As the court has now concluded, its difficulty with these photographs relates only to when each was taken.

Ortskrankenkasse (A.O.K.), the German General Health Insurance Agency, which monies are used to provide health care for German employees. These insurance payments are required pursuant to a law which has been in effect since 1914. Defendant's Exhibit 15 is an employee card for one Franz Walus, born July 29, 1922. Defendant's Exhibit 16 through 23 are copies of the employer payment records of employers August Zeller, Ludwig Stolz and Wally Welte. According to the information contained in these documents, insurance payments were made on a Franz Walus, born July 29, 1922, throughout the periods he was allegedly assigned to the respective farms. In fact, according to these records, it appears Walus was continuously employed thereon from 1940 through 1945 without interruption.

Two A.O.K. employees, Wilhelm Rehle and Margaritha Heichlinger, were presented in support of the A.O.K. records. Mr. Rehle holds a managerial position with the agency; he stated that A.O.K. documents are kept in private archives and are not accessible to the public. Mrs. Heichlinger has worked for A.O.K. since 1941. It was her duty during the period 1941–1945 to make entries on employer payment records. She identified handwriting on several of the documents now in evidence as her own. While she further indicated that it was her practice during this period to complete all posting within two days after receipt of the appropriate information, she also testified that during 1941–1945 she worked on thousands of insurance records.

Preliminarily, the court notes that the name of the covered worker on the A.O.K. records now in evidence is not consistently spelled, the name appearing "Wallus", "Wales" and "Walus". In view of the fact the records were posted manually, and were prepared exclusively from information supplied by various farmers, and considering the date of birth is consistent throughout, the court does not believe any adverse inference should be drawn from the spelling variances.

The probative value of the A.O.K. records was, however, qualified on numerous grounds. Mr. Rehle has been employed by A.O.K. since 1956; he necessarily therefore has no knowledge regarding public accessibility to A.O.K. documents prior thereto, nor of how A.O.K. forms were prepared during World War II. These facts limit the value of his testimony. Additionally, while both employer and employee cards were kept during 1940–1945, despite their efforts neither Mr. Rehle nor Mrs. Heichlinger was able to find an employee card for Walus during the periods covered by Defendant's Exhibits 16 through 23, and no employer card to pair up with Defendant's Exhibit 15. This lack of complete records is suspicious.

There are other factors which impeach these exhibits. First, the A.O.K. was under Nazi control during the war years. In fact, Mrs. Heichlinger's father was the Nazi Party member who ran the Gunzburg A.O.K. office from which Walus' records originated. Second, the records were prepared exclusively from information supplied by the various farmers; there was no personal contact between A.O.K. personnel and the covered worker. This affects their value as the records therefore contain only information from sources outside A.O.K. control. Furthermore, it has been established that several of Walus' farm employers were Nazi Party members during the relevant periods.

Finally, these records either impeach other aspects of the defendant's case, or have themselves been impeached thereby. The dates of Walus' residence in Germany as reflected by the A.O.K. documents conflict with the dates given by the five farmer witnesses. Additionally, while Walus claims to have escaped from the Zeller farm, and Mr. Rehle testified that if a farm worker escaped, his pay reported to A.O.K. would have been decreased, no such interruption of coverage or decrease in pay appears in these defense exhibits. And various statements by the witnesses regarding the presence or absence of other workers on their farms during or surrounding Walus' alleged presence are not supported by the A.O.K. documents.

Another unconvincing aspect of the A.O.K. records is the uninterrupted work history of Walus which they suggest. According to the A.O.K. documents, even though Walus was employed by four different farmers, there were no interruptions in either his employment or insurance coverage. The testimony of both Walus and the five farmers that he was repeatedly rejected because he was too weak, frail and unable to do his assigned duties cannot be reconciled with this employment history.

After World War II, the International Red Cross, in conjunction with the governments of various countries, endeavored to locate persons displaced by the war. The International Tracing Service was formed for that purpose. It caused forms requesting all available information on displaced individuals to be sent to local officials in war torn countries. Defendant's Exhibits 24 through 26 are copies of International Tracing Service documents listing foreigners known to have been in certain German towns during the war.

According to Exhibit 24, a Franz Walus, date and place of birth undecipherable, sojourned in Bubenhausen, Germany, from June of 1940 through May of 1941. Exhibit 25 lists a Franz Walus, born July 29, 1922. It indicates only that he was in Wullenstetten, Germany, for a period of four years. Exhibit 26 lists a Franz Walus, born July 29, 1922, as appearing on "personnel records" then stored in Gunzburg, Germany, and dated June 16, 1940. These lists were prepared on October 10, 1947, August 10, 1946, and February 19, 1949, respectively.

The information contained in these International Tracing Service documents does parallel the data in the A.O.K. records. On the other hand, this information apparently was prepared from the same sources that generated the A.O.K. documents, and these lists were not drawn up until after the war; at that time one who had been involved in Nazi activities would certainly have had the strongest desire to create a false identity. Such factors must be considered in evaluating the worth of the documents.

In the face of the impeaching factors the court has now discussed, the defendant's documentary exhibits are not the conclusive proof suggested by the defendant. Yet, even as qualified, these documents cannot be ignored. The court has concluded that in reaching its decision, the proper course is to confront the evidence of the Government against Frank Walus with this documentary evidence, as well as with all of the other evidence advanced by the defendant. It is only if, after weighing all of the evidence in this case, the Government has established its allegations by evidence which is clear, convincing, unequivocal and does not leave the issue in doubt that it is entitled to the relief it now seeks. It is to a detailed examination of the evidence presented by the United States that the court now turns its attention.

During the Nazi occupation of Poland, the SS and Gestapo governed all operations affecting the Polish Jews. The Gestapo, or state secret police, was part of the larger organization known as the Schutzstaffeln, or SS. Members of the Gestapo wore the two SS uniforms; one was an all-black dress uniform and the other was grey-green in color. Both uniforms bore the totenkopf or death's head insignia. Among its many duties, the Gestapo had responsibility for controlling the Jewish populations in the Czestochowa and Kielce ghettos.

Twelve persons testified to the alleged activities of Walus in Poland during the Second World War. Ten of these, David Gelbhauer, Josef Koenigsberg, Moniek Rozanski, Elieser Gliklich, Chaim Beigelman, Beinisz Neuhaus, Isaac Sternberg, Anna Kremski, Frank Silver, and Simon Mlodinow, were residents of Czestochowa at the outbreak of World War II and were forced to live in the ghettos established by the Nazi occupying forces. Two witnesses, Meylich Rozenwald and Sara Leichter, resided in Kielce; they too were restrained in the Jewish ghettos.

All twelve individuals testified to observing Frank Walus wearing either or both of the black and grey-green uniforms of the SS. They recalled that his dress on these

occasions bore the totenkopf. Additionally, Walus was armed at various of the times they saw him. Every one of these people stated unequivocally that Walus was a member of the Gestapo. This conclusion was based on his dress, the position of authority he held over Jews, and the fact that he was seen in the company of other Gestapo personnel.

Their knowledge that this individual was Frank Walus was not only based on information from third persons, but was also directly obtained. The witnesses Gelbhauer, Koenigsberg, Rozanski, Gliklich and Beigelman all were required to perform jobs which mandated their presence at Gestapo headquarters in Czestochowa. The witness Rozenwald was first an aufsicht, then an ordnungsdienst;[6] as such he was required to deliver mail to the Gestapo office in Kielce. In the course of their appearances at Gestapo headquarters, the witnesses saw the defendant and heard him referred to by name.

Gelbhauer stated that he saw the defendant's name on a list of Gestapo personnel posted at Gestapo headquarters. Rozenwald testified to seeing Walus' name on certain of the letters he delivered and also that he heard other Gestapo personnel refer to the defendant by "Walus" and/or "Frank". To the same effect was the testimony of Rozanski, Koenigsberg and Gliklich; they too heard the defendant addressed as "Walus" and/or "Frank". While these witnesses acknowledged that they could not say whether the arrangement was "Frank Walus" or "Walus Frank", all were firm in their recollections that both the names "Frank" and "Walus", either singly or in combination, were used to refer to the person they have identified as the defendant. Finally, Isaac Sternberg, who worked as a prison tailor, saw Walus' name on several work orders; in fact, he himself, under directions from Walus, tailored a woman's coat.

Numerous acts of unjustifiable violence were recounted. Gelbhauer stated that he witnessed Walus bring both Jews and Polish officers to the Czestochowa headquarters for examination; Gelbhauer was required to be present during some of these interrogations. He heard screams and witnessed individuals leave the sessions in a battered and bloody condition. On certain occasions, it was even necessary for Gelbhauer to assist those unable to walk from the interrogation room after Walus had finished with them. Moniek Rozanski and Elieser Gliklich also saw the individual they identified as the defendant bring Jews or Poles to Gestapo headquarters. Gliklich testified to numerous instances when Walus clubbed these people; one such individual was Gliklich's own father. Rozanski witnessed the defendant beat one Jewish male to death with an iron bar; at the time, he was within approximately 15–20 meters of Walus. Rozanski also saw the defendant forcibly requisition goods from numerous Jews. In the process, Walus beat various of these individuals, among them Rozanski's own uncle. Frank Silver and Simon Mlodinow testified that they themselves were victims of attacks by Walus. Mlodinow also testified that he witnessed the defendant shoot a woman on the street.

Gestapo agents had authority to raid the living quarters of ghetto Jews. Josef Koenigsberg testified that Walus, along with one Shabelski, conducted a search of Koenigsberg's apartment. When Koenigsberg's father failed to open a sofa as quickly as ordered, Walus clubbed the man. Chaim Beigelman recounted an incident in which Walus beat and dragged a neighbor out of his dwelling. Walus struck the neighbor on the head with his gun. Similar testimony was received from Beinisz Neuhaus. On a Sunday morning late in 1942, Anna Kremski stated that the man she identified as the defendant broke into her apartment with revolver drawn. As he aimed the weapon at her husband, she fell upon Walus, beg-

6. An ordnungsdienst was a Jewish individual with police-type responsibilities within the ghetto. His duties included administrative functions. As such, an ordnungsdienst necessarily had direct contact with the Gestapo. An aufsicht was subordinate to the ordnungsdienst.

ging him not to kill the husband. Thereupon, Walus exited the dwelling and went to an upper floor. A shot was heard. Moments later, Mr. Eigenberg, a distant relative of Mrs. Kremski, was found in his bed, dead from a gunshot wound.

Numerous individuals also testified to witnessing the defendant perform acts of unrestrained violence during the liquidations of the Jewish ghettos. Gelbhauer stated that during the liquidation of the large ghetto in Czestochowa he was required to load bodies for transport to community graves. He saw a man he identified as Walus stop a Jewish woman and her two young daughters, and order the mother to disrobe. When she refused, Walus killed her. He next shot and killed both children. Gelbhauer also witnessed the defendant kill a Polish partisan as that individual was attempting to escape from a cemetery on the outskirts of Czestochowa.

Koenigsberg observed the individual he identified as Walus participate in the separation of able-bodied males from the women, children and men unable to work. The latter group was transferred to the destruction camp at Treblinka. When a Jewish attorney begged Walus to be allowed to accompany his wife and child, Walus, after first offering comfort, shot and killed the man. Meylich Rozenwald witnessed the defendant, while in the course of carrying out a command to search ghetto dwellings for any remaining Jews, murder an elderly woman who was too weak to walk. Rozenwald also saw Walus shoot and kill two of that witness' childhood friends.

Sara Leichter was a nurse in the Jewish hospital in Kielce. At the time the hospital in the small ghetto was closed, parents and children were assembled. The man she identified as the defendant, in the company of other uniformed Gestapo officers, led a group of the assembled children, some as young as four or five years of age, into an adjacent building. Mrs. Leichter heard shots and screams. As the shooting ceased, the building fell silent.

Because the testimony from these twelve individuals addressed events of over thirty-five years ago, this court is keenly aware of its duty to weigh their testimony with circumspection. This requirement of caution has its greatest importance as the court considers the identifications of this defendant as the perpetrator of or participant in the acts recounted. It is with these considerations in mind that the court has examined the identification process utilized by the Government.

The United States received information that Frank Walus may have been associated with the Gestapo operations in Kielce and Czestochowa. By various means, primarily through the offices of the Government of Israel, individuals who resided in these Polish cities were located. Each was interviewed and shown certain photographic displays,[7] each of which included a picture of the defendant when he was either thirty-six or forty years old. These photographs were obtained from Walus' 1958 and 1962 immigrant visa applications. Individuals who remembered the defendant by name and/or recognized his likeness from the pictures shown them were subsequently deposed by Assistants from the Chicago office of the United States Attorney. Finally, each individual presented by the United States at trial was called upon to identify the defendant in open court.

Pretrial identification procedures, primarily as they relate to criminal prosecutions, have been given detailed consideration by the courts. While the instant proceeding is a civil matter, due to the nature of the allegations against Frank Walus and the valuable right of citizenship sought to be withdrawn, it is to these authorities that the court turns for guidance. *Costello v. United States,* 365 U.S. at 269, 81 S.Ct. 534; *Chaunt v. United States,* 364 U.S. at 353, 81 S.Ct. 147.

The United States Supreme Court has on numerous occasions recognized that there are dangers inherent in pretrial identification procedures. It has therefore cautioned that pretrial identification procedures must

7. These displays are now in evidence as Plaintiff's Exhibits 1, 8, 9 and 10.

be fair and neutral, as due process protects the accused against the introduction of identification evidence tainted by pretrial identifications obtained, whether intentionally or otherwise, through unnecessarily suggestive methods. *See Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 462–464, 54 L.Ed.2d 424, 431–433 (1977); *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *Kirby v. Illinois,* 406 U.S. 682, 690–691, 92 S.Ct. 1877, 34 L.Ed.2d 411 (1972); *United States v. Wade,* 388 U.S. 218, 228–239, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *See also Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 40 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The major threat attending an improper pretrial identification is that the witness will be predisposed to adhere to that identification in subsequent testimony at trial. *Moore v. Illinois,* 434 U.S. at 223, 98 S.Ct. at 462, 54 L.Ed.2d at 431. *United States v. Wade,* 388 U.S. at 229, 235–236, 87 S.Ct. at 1926.

In evaluating the identification procedures carried out in this case, *Manson v. Brathwaite* is instructive. There, the utilization of a pretrial photographic examination as part of the identification process was at issue. The Court, after reviewing the various approaches taken by courts of appeal in dealing with the problem of eyewitness identification, held that the proper course in determining the admissibility of identification testimony is simply to evaluate the underlying reliability of the testimony. *Neil v. Biggers,* 409 U.S. 188, at 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), was cited for a statement of the factors to be considered. *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243. In *Biggers,* the

Court stated that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.' *Simmons v. United States,* 390 U.S. 377 at 384, 88 S.Ct. 967, 19 L.Ed.2d 1247." 409 U.S. at 198, 93 S.Ct. at 381. The Court then held that:

. . . the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. 409 U.S., at 199–200, 93 S.Ct. at 382.

*See also United States v. Barber,* 442 F.2d 517, 525–528 (3rd Cir. 1970), *cert. denied,* 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 and 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971); *United States v. Telfaire,* 152 U.S. App.D.C. 146, 469 F.2d 552 (1972).

In the instant case, ten of the Government's eyewitnesses selected the photograph of the defendant, Frank Walus, from several others viewed in combination therewith, and positively identified the individual in that photograph as the person who had committed the acts as to which each has now testified.[8] Additionally, of the eleven eyewitnesses who personally appeared and testified at trial,[9] ten made positive identifications of Frank Walus in open court. The court has examined the photographic displays used by the Government in the pretrial identification process,[10] and has concluded that no suggestive element was contained therein. From its comparison of the photographs of Walus in these displays with the photographs placed in evidence by the defendant,[11] and with the defendant as he appeared at trial,[12] the court is satisfied that these witnesses could and did make

---

8. The witnesses Beigelman and Neuhaus could not do so.

9. The witness Beigelman did not appear in court; only his deposition testimony was presented.

10. Plaintiff's Exhibits 1, 8, 9, 10.

11. See especially Defendant's Exhibit 38, which the defendant himself testified was taken in 1946. He was then twenty-five years of age.

12. The defendant was present throughout this trial.

positive identifications of Frank Walus at the time each viewed the photographs.

The defendant advanced several factors which he contends qualify or negate the value of the Government's eyewitness testimony. First, he argues that a high degree of suggestiveness was present at the pretrial interviews. The witness Rozenwald did acknowledge that when he could not identify the photograph of Walus in the display, it was pointed out to him. Nevertheless, he still failed to identify Walus. Subsequently, a single photograph of the defendant was shown him and identified as such, and the witness remained unable to make an identification. However, other witnesses specifically denied any such directive influence. Thus, Rozenwald's refusal to make any identification supports the Government's argument that his credibility has thereby been augmented.

Second, the defendant correctly points out that during the pretrial identifications, certain of the witnesses admitted that the defendant's name was suggested to them. Others stated, however, that they were subjected to no such prompting, and specifically recalled the name independent of any suggestion. Several could not remember whether the defendant was named "Walus Frank" or "Frank Walus", but all were able to associate the name with the individual each has identified as the defendant, as well as with his photograph.

Of more importance, in the opinion of this court, is the fact that the attempts by defense counsel to demonstrate inconsistencies in the witnesses' recollections of the age, appearance, build and height of the individual each identified as the defendant largely resulted in corroboration among witnesses. While there were differences among them, their testimony was generally consistent, and reflected an individual of Walus' general age, height and build. The variances were not great, and thus could be accounted for by the length of time involved and the fact that the defendant was viewed on numerous occasions in uniform. To several people, a person in uniform, especially one in Gestapo dress, unavoidably takes on a more imposing, and thus somewhat larger and more mature appearance. Also impressive in this connection was the testimony of several witnesses that the man they have identified as the defendant was heard to speak in both Polish and German; Frank Walus does speak both languages.

On this issue of identification, one final point is in order. As the Supreme Court pointed out in *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375, and reaffirmed in *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243, key factors in evaluating eyewitness identifications are the opportunity of the witness to view the accused at the time of the alleged act(s), the degree of the witness' attention, and the length of time the accused was viewed by the witness. *See also United States v. Barber,* 442 F.2d at 525; *United States v. Telfaire,* 152 U.S. App.D.C. at 152, 469 F.2d at 558. These witnesses were exposed to Walus over a span of years, most having seen him through the liquidations of 1942 and 1943. He was an individual, according to their testimony, to be known and avoided.

The eyewitness identification of one witness, Simon Mlodinow, was further strengthened by a chance encounter between that witness and the defendant on a Chicago subway train in approximately 1970 or 1971. Mlodinow testified that at that time he recognized Walus as an individual he remembered from Czestochowa. It was not until later that he recalled why he knew Walus in Czestochowa.

The testimony of the Government's eyewitnesses was both powerful and largely unshaken by able cross-examination. But it cannot be ignored that these witnesses have been called upon to recount events which occurred over thirty-five years ago. The court has, therefore, evaluated their testimony with both caution and reserve.

In addition to its eyewitness testimony, the Government presented four persons, Michael Alper, his wife Theresa Alper, George Powers and William Zapart, who recounted admissions made to them by Frank Walus. These statements, coming as they did from the defendant himself, were critical to the court's decision in this case.

Michael Alper lived with Walus' family from July, 1971, through May of 1972, and again from March, 1973, through May, 1973. According to Michael Alper, Walus admitted that he, Walus, had lived in Czestochowa, Kielce and Radom, Poland, during the Second World War. Alper testified that Walus stated he was sent to Germany after 1943 and lived near Ulm, Germany, through 1945. There, he spied for the Gestapo on slave laborers. The Government's eyewitnesses place Walus in Poland only until 1943.

The defendant also admitted to Alper that during World War II, he, Walus, helped the Gestapo and German police liquidate Jews and catch Poles who were aiding Jews. Walus' statements, as testified to by this witness, included accounts of extreme violence, including murders by Germans of children. Additionally, the defendant allegedly admitted that he has continued to correspond with and visit his former Gestapo superiors now residing in the area of Ulm, Germany. This is the area from which many of the defendant's witnesses came. Finally, Alper testified that Walus once showed him a photograph of Walus in an American Army uniform and stated that it was taken on the advice of Gestapo associates in case a "cover-up" was ever needed.

The defense brought out that Alper continued to reside with Walus after hearing these statements, and even corresponded with the Walus family while living in Vienna during 1972–1973. Alper explained that he had moved into Walus' home shortly after emigrating to the United States from Poland, as he had no other place to go. He also testified that while he could not "get along" with Walus, he was close to the other family members. Alper further testified to a material change in Walus' attitude and statements after the defendant learned of associations by Alper with the Jewish community in Chicago.

In an effort to demonstrate bias, it was established that Alper is of Jewish ancestry, and lost both of his parents to the Nazis. It was also established that the parties' relations soured in 1973. Walus apparently embarked on a campaign to darken Alper's reputation among his friends and in the community generally. These attempts assertedly led Michael Alper to change his name "in order to begin a new life."

Theresa Alper is a native of Poland who emigrated to Chicago in March of 1973. Together with her husband she accepted residence in the Walus' home through May of that year. Mrs. Alper also testified to hearing Walus tell of living in Czestochowa, Kielce and Radom, Poland, until he was sent to Germany at some point in 1943. According to her testimony, during several conversations Walus claimed an association with the Gestapo. He was said to have described acts of violence against pregnant women during the liquidation, random killings carried out as an example to discourage aid to Jews, and instances of catching Poles who were assisting members of the Jewish population.

Evidence of bias on the part of Theresa Alper was also presented. But even accepting the existence of strong illwill toward Walus on the part of the Alpers, after observing these witnesses as each testified, this court is satisfied that, in substance, Walus did make the various statements now examined. This testimony directly corroborates the eyewitness accounts of the twelve ghetto residents. The testimony of two former fellow employees of Frank Walus lends support to this conclusion. They recounted numerous stories by Walus of his World War II involvement in the German military and exposure to the German concentration camps.

In the final analysis, the evidence in this case is in direct conflict. The court has exhaustively examined all of that evidence, and, as is its duty, has weighed the credibility thereof. *Hosapple v. Woods,* 500 F.2d 49 (7th Cir. 1974); *Komie v. Buehler Corp.,* 449 F.2d 644 (9th Cir. 1971); *Lichter v. Goss,* 232 F.2d 715 (7th Cir. 1956). The court has concluded that in the face of the case presented by the United States, it cannot accept what was essentially an alibi defense by Frank Walus. The defendant's evidence simply contained too many

impeaching factors to warrant its acceptance by the court.[13] Rather, this court now finds that the defendant, Frank Walus, was a Gestapo operative or agent operating in and around Czestochowa and Kielce, Poland, during World War II. Acting in that capacity, he did commit acts of unjustified violence which were criminal and must properly be described as war crimes or war atrocities. This information was knowingly concealed by Frank Walus throughout the process of naturalization which resulted in the issuance of his Certificate of Naturalization. Walus' United States citizenship was therefore illegally procured both because Walus obtained his naturalization by concealment of material facts or by willful misrepresentation and because Walus lacked the good moral character required for United States citizenship. These conclusions have been established by evidence which is clear, convincing, unequivocal and does not leave the issue in doubt. *Costello v. United States,* 365 U.S. at 269, 81 S.Ct. 534; *Chaunt v. United States,* 364 U.S. at 353, 81 S.Ct. 147; *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943); *Baumgartner v. United States,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944), and the various other lower court cases previously cited.

▇▇ In reaching this decision, the court rejects the arguments raised by Walus as affirmative defenses in his answer. First, because a certificate of citizenship illegally obtained is void *ab initio,* contrary to the argument of the defendant, there is no statute of limitations applicable to denaturalization proceedings. 8 U.S.C. § 1451. On its face, the assertion that because the underlying events occurred some thirty-seven years ago, Fifth and Sixth Amendment principles preclude the Government from now bringing this action similarly lacks merit. With the passage of time, the Government's task may have escalated; however, no constitutional guarantee has

been implicated thereby. Finally, even if by such arguments the defendant is attempting to present the defense of laches, that defense is without merit. The defendant's Certificate of Naturalization was issued only some six years prior to the time this action was filed, and there has been nothing to indicate a lack of diligence by the United States. Therefore, the defense of laches is not available in this denaturalization proceeding. *Costello v. United States,* 365 U.S. at 281–284, 81 S.Ct. 534; *United States v. Oddo,* 314 F.2d 115 (2nd Cir. 1963), *cert. denied,* 373 U.S. 833, 84 S.Ct. 50, 11 L.Ed.2d 63; *United States v. Cufari,* 120 F.Supp. 941 (D.C.Mass.1954), *vacated on other grounds,* 217 F.2d 404 (1st Cir. 1954).

According to its duty in this case, because of the decision it has reached, this court must now order, and it does hereby order, that judgment be entered in favor of the plaintiff United States of America and against the defendant Frank Walus on all four counts of the United States' complaint. The order of the United States District Court for the Northern District of Illinois entered on August 18, 1970, admitting Frank Walus, also known as Franciszek Walus, to United States citizenship will be, and the same hereby now is, revoked and set aside. The Certificate of Naturalization (Certificate Number 9308391) issued to this individual will be, and the same hereby now is, ordered canceled. The defendant is hereby permanently enjoined from claiming any rights, privileges or advantages under or through any document evidencing United States citizenship. Finally, the defendant Frank Walus, also known as Franciszek Walus, is hereby ordered and directed to deliver and surrender his Certificate of Naturalization to an authorized representative of the Attorney General of the United States of America on or before June 9, 1978.

---

13. In its post trial brief, the United States has advanced a Gestapo cover-up conspiracy theory to explain the defendant's documentary evidence. The court does not find that hypothesis to be supported by the evidence. How the documents were generated was not established. Their origin is, however, of no importance. Whatever their source, in the opinion of this court those records do not reflect the defendant's activities during World War II.

This memorandum of decision, containing as it does the findings of fact and conclusions of law of the court, is intended to satisfy the requirements of Rule 52(a) of the Federal Rules of Civil Procedure.